IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 10, 2008

Charles R. Fulbruge III
Clerk

No. 05-60588

MARION WALTMAN,

Plaintiff - Appellant,

v.

GEORGE PAYNE, in both his official and individual capacities,

Defendant - Appellee.

Appeal from the United States District Court
for the Southern District of Mississippi

Before GARWOOD, DENNIS, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Marion Waltman sued Sheriff George Payne, Jr. in his individual and official capacities for the destruction of 500 kenaf plants—a plant that closely resembles marijuana—on Waltman's hunting lease. The district court granted Payne qualified immunity in his individual capacity, held that Waltman's Fifth Amendment takings claim was not ripe, and granted Payne summary judgment on the claims in his official capacity. We affirm in part, and we vacate and dismiss without prejudice in part.

I

Marion Waltman held a hunting lease on approximately 1500 acres in Harrison County, Mississippi. He purchased kenaf seed from a local distributor and planted it in an open field on the lease between two power lines. Waltman positioned deer hunting stands around this field because Mississippi State University had recently concluded that certain strains of the kenaf plant, normally cultivated as an alternative to wood pulp for use in paper, attracted deer and other wildlife. The plant also increased the mass of deer who ate it, creating larger hunting trophies. Marijuana and all varieties of kenaf share some attributes, but certain strains of kenaf are virtually indistinguishable from marijuana by visual inspection.

Troy Peterson, a Harrison County sheriff's deputy assigned to a DEA task force, received an anonymous tip that a large marijuana crop was growing between power lines in a field in Harrison County. Law enforcement officials with the Drug Enforcement Agency–High Intensity Drug Trafficking Area (DEA–HIDTA) and the Mississippi Bureau of Narcotics (MBN) planned an investigation based on the tip. In accordance with that plan, Peterson stationed himself at the gate to the suspected property. A sign on the gate stated that the land was under the control of the Boar Hog Hunting Club. Meanwhile, Major Randy Cook, the director of operations for the Harrison County Sheriff's Department who had aerial drug identification and eradication experience, and another task force operator conducted a "fly-over" of the area in a helicopter to determine the location and identity of the suspicious plants. The fly-over revealed a symmetrical crop planted under the power lines, a common location for marijuana crops because this made it difficult to determine ownership of the crop and rarely resulted in a prosecution. Major Cook saw what he believed to be marijuana plants scattered throughout larger plants in the field.

Sheriff Payne was waiting at the Harrison County Jail. Cook radioed Payne, shared his findings, and the helicopter picked up Payne so that he could observe the crop from the air as well. By the time the helicopter landed near the field for Payne to examine the crop from the ground, other law enforcement officers were already on the property. There was no discussion about whether a warrant was required because the officers believed that an "open fields" exception applied and that the plants were deliberately located on the power company's right-of-way to avoid prosecution. Payne spoke with numerous officers from the DEA–HIDTA and the MBN about the alleged marijuana crop. Most of the field did not appear to be planted with marijuana, but approximately 500 plants interspersed with the others did look like marijuana. Most of the plants were broadleafed, meaning the leaves grew out of a central leaf. Marijuana is a palmate plant, in which an odd number of leaves originate from the stem. The 500 plants that resembled marijuana were also palmates. It was later discovered that the broadleafed plants were Everglade 41 kenaf, and the plants most resembling marijuana were T-2 kenaf. Many of the officers were convinced that the plants were marijuana, but at least one officer was unsure. This officer nevertheless noted that he thought it was more likely than not that the palmate plants were marijuana.

A sample plant was cut from the field and brought to the office of Captain Pope, head of the narcotics division at the Gulfport Police Department. Although Captain Pope had never performed a field test during the 27 years he had served in law enforcement, he conducted the Marquis Reagent field test on the plant, and the result was negative for THC—the active drug compound in marijuana. Pope also stated that he could tell by looking at the plant that it was not marijuana, but Pope's testimony suggests that he was only sent a sample of the non-palmate Everglade 41 kenaf. Captain Pope notified Sheriff Payne and Major Cook by telephone that the test was negative for THC. Sheriff Payne then

3

had a discussion with a number of other officers about the field test's unreliability when performed on plants that had not been dried or cured for a number of days, ultimately dismissing the test as inconclusive since it had been performed on a freshly cut plant.

After considering a number of factors such as the appearance of the plants, their location underneath the power lines, their being hidden within a larger crop of non-marijuana plants, the opinions of most law enforcement officers that the plants were in fact marijuana, reports that children had been frequenting the fields, and concerns that residents would have been alerted to the presence of the field by the circling helicopter and press coverage and would attempt to harvest some of the plants, Sheriff Payne decided to remove the 500 palmate plants from the field. Payne did not believe that the Harrison County Sheriff's Department had the resources to station officers to monitor the fields with the plants in place while a sample was cut, dried, and then tested reliably. Sheriff Payne called in an inmate work force, which cut down and removed approximately 500 plants from the property. MBN then took custody of the plants and destroyed them pursuant to internal policies.

While watching that evening's 6:00 p.m. news, Waltman learned about the search and the seizure of the plants. He contacted the sheriff's office, informing Payne that the alleged marijuana was actually kenaf, a legal wildlife food product. This was the first time any of the law enforcement officers had heard of kenaf, and this was also their first indication that Waltman held a possessory interest in the land. Payne then had both varieties of the plants grown in the field tested by Mississippi State University, which conclusively identified them as the Everglade 41 and T-2 varieties of kenaf.

Waltman sent Payne and the Harrison County Sheriff's Department a notice of claim letter as required by the Mississippi Tort Claims Act. The letter went unanswered. Waltman then sued Sheriff Payne in his official and

individual capacities asserting a variety of claims in federal district court pursuant to 42 U.S.C. § 1983. The district court granted qualified immunity and summary judgment to Payne on the federal claims and dismissed the state claims without prejudice. Waltman now appeals.

## II

Sheriff Payne's liability in his individual capacity is limited by the doctrine of qualified immunity, which "shields government officials performing discretionary functions from liability unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known."[1] Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[2] Once a government official acting with discretionary authority raises qualified immunity as a defense against a § 1983 claim, the burden shifts to the plaintiff to rebut the qualified immunity defense.[3]

To rebut the qualified immunity defense, the plaintiff must show: (1) that he has alleged a violation of a clearly established constitutional right, and (2) that the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident.[4] We review the district court's grant of qualified immunity de novo.[5]

Waltman claims that Payne violated his Fourth Amendment protections against unreasonable search and seizure by directing the seizure of approximately 500 of the kenaf plants. Though the Fourth Amendment protects

---

[1] Babb v. Dorman, 33 F.3d 472, 477 (5th Cir. 1994) (quotations and citations omitted).

[2] Malley v. Briggs, 475 U.S. 335, 341 (1986).

[3] Johnson v. Deep East Tex. Reg'l Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004).

[4] Hare v. City of Corinth, Miss., 135 F.3d 320, 325 (5th Cir. 1998).

[5] Beltran v. City of El Paso, 367 F.3d 299, 302 (5th Cir. 2004).

against "unreasonable searches and seizures," the open-fields doctrine establishes "that an individual has no legitimate expectation that open fields will remain free from warrantless intrusion by government officers."[6] Under the open-fields doctrine, Payne's entry onto the property was a legal search.

It is well-established that under certain circumstances, officers may seize evidence in plain view without a warrant.[7] The plain view doctrine will support a warrantless seizure if: (1) the officer was lawfully in the position from which the object was plainly seen; (2) the object was in plain view; (3) the object's incriminating nature was immediately apparent; and (4) the officer had a lawful right of access to the object itself.[8] Waltman challenges the third prong, claiming that the incriminating nature of the alleged marijuana was not immediately apparent. Under this prong, the incriminating nature of an object is immediately apparent if the officers had probable cause to believe that the object was contraband or evidence of a crime.[9] Probable cause does not require certainty, and we consider the totality of the circumstances, including the officers' training and experience and their knowledge of the situation at hand.[10] "[I]f officers of reasonable competence could disagree on [probable cause], immunity should be recognized."[11]

Here, a number of factors led Payne to believe that the kenaf was marijuana. The investigation was performed by narcotic specialists from the DEA–HIDTA and the MBN who have received advanced training and experience

---

[6] Oliver v. United States, 466 U.S. 170, 181 (1984).

[7] Horton v. California, 496 U.S. 128, 134 (1990).

[8] Id. at 136-37.

[9] United States v. Buchanan, 70 F.3d 818, 826 (5th Cir. 1995).

[10] Id.

[11] Mendenhall v. Riser, 213 F.3d 226, 230 (5th Cir. 2000) (quotation omitted).

identifying and eradicating marijuana. Most of the officers were confident that the kenaf was marijuana, and even the officers who were not convinced thought that it was likely. Payne himself had received training in marijuana identification and had significant experience in narcotics. The plants were also planted in fields between power lines, an area where illegal marijuana crops are frequently found. The fields were located on land marked as a hunting club, which the record reflects is another common tactic of marijuana growers in rural Mississippi. The plants themselves were interspersed among a larger crop of plants that did not resemble marijuana—similar to a practice that the record indicates is employed to conceal marijuana plants among a legal crop. The physical appearance of the T-2 kenaf itself resembles marijuana—both are palmate plants with an odd number of sawtooth leaves.

Waltman claims that two pieces of evidence render a finding of probable cause unreasonable: the negative result of Captain Pope's field test for THC and the testimony of Captain Steve Campbell that a preponderance of the plants were not marijuana. Pope admitted that he did not have experience with the field test and that this was his first use of the test. Pope later noted that he was unfamiliar with the reliability of the field test when used on fresh plants. Multiple officers familiar with the field test stated that it is unreliable when used on plants that are recently cut or still growing—the test is designed for plants that have been dried or cured over extended periods of time. Sheriff Payne testified that he has had personal experience with the field test providing false negatives for actual marijuana plants that were recently cut. Payne testified that he was aware of the unreliability of the field test in the instant case and discussed it with a number of other officers at the scene who had similar reservations regarding Pope's findings. Pope also noted that he told Payne that the plant did not resemble marijuana because it was a broadleaf, and Payne testified that he thought Pope was mistakenly sent a sample of the

broadleaf Everglade 41 kenaf instead of the palmate T-2 kenaf which closely resembled marijuana. Payne chose to discount Pope's test and visual identification because he knew that the field test was unreliable on fresh plants and that Pope had possibly been sent the broadleaf instead of the palmate plant.

Waltman is correct that Campbell testified that a majority of the plants did not resemble marijuana, but this fact fails to make the seizure of the small number of plants that did resemble marijuana unreasonable. It is undisputed that most of the plants did not resemble marijuana upon close inspection, but these plants were left undisturbed. Waltman has failed to meet his burden of showing that Sheriff Payne lacked probable cause to believe that the kenaf was marijuana, and Payne is entitled to qualified immunity against Waltman's Fourth Amendment claim.

Waltman also claims that Payne violated his Fourteenth Amendment right to due process by seizing his kenaf plants without a warrant. Although couched in terms of due process, this claim is an extension of Waltman's Fourth Amendment claim, discussed above. For the reasons stated above, we affirm the district court's grant of qualified immunity on the Fourteenth Amendment due process claim relating to the seizure.

Waltman further claims that Payne violated his Fourteenth Amendment rights by damaging the liberty interest in Waltman's good name and reputation without due process by appearing on television to discuss a "possible massive marijuana bust" when Payne knew or should have known that the plants were not marijuana. He contends that although Payne never mentioned him by name, it was soon known that he was the lessee of the property and was subjected to derisive comments in the community. A person's interest in his reputation alone, apart from some more tangible interest such as employment, is not a sufficient liberty or property interest to fall within the ambit of the Due

Process Clause.[12] Waltman fails to show the violation of a clearly established constitutional right, so we affirm the district court's grant of qualified immunity for Waltman's Fourteenth Amendment due process claim relating to his liberty interests.

## III

Waltman next alleges that the district court incorrectly held that Waltman's Fifth Amendment takings claim against Payne in his individual and official capacities was not ripe. We review ripeness determinations de novo.[13] Under the Takings Clause, a takings claim is not ripe "until (1) the relevant governmental unit has reached a final decision as to what will be done with the property and (2) the plaintiff has sought compensation through whatever adequate procedures the state provides."[14] The district court held that there was no evidence in the record to indicate that Waltman had ever sought compensation in any Mississippi forum for the alleged taking and destruction of the kenaf crop. On this basis, it granted summary judgment to Payne on Waltman's takings claim.

Waltman correctly notes that the record indicated a "tort claims letter" sent from Waltman to Payne and Larry Benefield, the president of the Harrison County Board of Supervisors. This letter states that it is meant to act as a "notice of claim" as required by the Mississippi Tort Claims Act.[15] Payne failed to answer the letter, and Waltman did not proceed any further under the Mississippi Tort Claims Act after sending the letter.

---

[12] Paul v. Davis, 424 U.S. 693, 701 (1976).

[13] Monk v. Huston, 340 F.3d 279, 281 (5th Cir. 2003).

[14] Sandy Creek Investors, Ltd. v. City of Jonestown, Tex., 325 F.3d 623, 626 (5th Cir. 2003).

[15] MISS. CODE ANN. § 11-46-11 (2002).

The question before us is whether a notice of claim letter is sufficient to satisfy the requirement that Waltman seek and be denied compensation through the procedures provided by Mississippi. We have previously interpreted adequate state procedures to include both administrative and state court remedies.[16] Mississippi has provided an adequate procedure for compensation in the Mississippi Tort Claims Act.

Merely sending a notice of claim letter is not sufficient for a plaintiff to avail himself of the adequate state judicial procedure provided in the Mississippi Tort Claims Act. The notice of claim letter is a prerequisite to bringing a claim under the act, but it is not an end in and of itself. A notice of claim provides the entity an opportunity to respond with compensation or to deny the claim, but the entity is under no obligation to respond and may choose to remain silent—just as Sheriff Payne did.[17] Once the plaintiff files a notice of claim and the defendant has been given an opportunity to respond, the plaintiff may then sue under the act. Waltman never filed suit under the act and accordingly never resorted to available state judicial remedies for just compensation. His takings claim was not ripe. Consequently, we vacate the district court's grant of summary judgment to Payne on Waltman's takings claim and dismiss this claim for lack of subject matter jurisdiction. Our judgment is without prejudice to Waltman's right to seek compensation through Mississippi's adequate procedures for this purported taking. In concluding that the federal takings claim is not ripe, we do not intimate any views on its merits.

---

[16] See Sandy Creek, 325 F.3d at 626 ("Here, Sandy Creek has not exhausted its administrative or state court remedies as required by the second prong of Williamson County.").

[17] MISS. CODE ANN. § 11-46-11 (2002).

IV

Waltman also argues that the district court erroneously granted summary judgment to Payne on the claims against Payne in his official capacity. We review the district court's grant of summary judgment de novo.[18] Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[19] Waltman's claims against Payne in his official capacity are treated as claims against Harrison County.[20] The district court relied on the general rule that a governmental entity or municipality can be held liable under § 1983 only if official policy or custom caused the deprivation of a constitutional right.[21] Finding no official policy or custom, the district court granted summary judgment for Payne.

The district court failed to recognize the single-incident exception to the general rule: a single decision by an individual with "final policy-making authority" can in certain instances be grounds for liability under § 1983.[22] In Mississippi, sheriffs are final policymakers for their respective department's law enforcement decisions made within their counties.[23] To prove liability under the single-incident exception, a plaintiff must at least show (1) that the defendant acted with deliberate indifference by disregarding a known or obvious

---

[18] Cousin v. Small, 325 F.3d 627, 637 (5th Cir. 2003).

[19] FED. R. CIV. P. 56(c).

[20] Brooks v. George County, Miss., 84 F.3d 157, 165 (5th Cir. 1996).

[21] Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 694 (1978).

[22] Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986).

[23] Brooks, 84 F.3d at 165.

consequence of his action and (2) that there is a direct causal link between the defendant's action and the deprivation of federal rights.[24]

For the reasons considered above, Waltman has failed to show that Payne acted with deliberate indifference. We affirm the district court's grant of summary judgment on the claims against Payne in his official capacity.

* * * *

We AFFIRM the district court's judgment in part. We VACATE and DISMISS without prejudice in part.

---

[24] In re Foust, 310 F.3d 849, 862 (5th Cir. 2002).